# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Subpoena to Jesse Eisinger, | x |
|                Non-party Movant. | Misc. No. _11 MISC 00060_ |
| ----------------------------------------------- | |
| BAKER and BAKER, | |
|                Plaintiffs, | Case Pending in U.S. District Court for the District of Massachusetts No. 09-10053-PBS |
| v. | |
| GOLDMAN SACHS & CO., et al., | |
|                Defendants. | |
| ----------------------------------------------- | x |

**MEMORANDUM OF NON-PARTY MOVANT JESSE EISINGER
IN SUPPORT OF MOTION TO QUASH SUBPOENA**

Gayle C. Sproul
Amanda M. Leith
LEVINE SULLIVAN KOCH & SCHULZ,
    L.L.P.
321 West 44th Street, Suite 510
New York, NY 10036
Tel: (212) 850-6100
Fax: (212) 850-6299
gsproul@lskslaw.com
aleith@lskslaw.com

*Counsel for Non-Party Jesse Eisinger*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ........................................................................................................................ 1

ARGUMENT .............................................................................................................................. 4

I.     NEW YORK'S SHIELD LAW PROTECTS A REPORTER'S
UNPUBLISHED WORK PRODUCT FROM DISCLOSURE .......................................... 4

II.    PLAINTIFFS CANNOT MEET THEIR BURDEN ........................................................... 9

        A.     The Information Sought Is Not
Critical or Necessary Plaintiffs' Case ................................................................... 9

        B.     The Information Is Available Elsewhere ............................................................ 12

III.   EVEN WHERE NOT SUBJECT TO A PRIVILEGE, THE
COURT SHOULD ENSURE THAT A NON-PARTY IS NOT
UNDULY BURDENED BY A SUBPOENA SEEKING NON-
PROBATIVE INFORMATION ......................................................................................... 14

CONCLUSION ........................................................................................................................ 17

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Blum v. Schlegel,*
150 F.R.D. 42 (W.D.N.Y. 1993) ....................................................................................11, 12

*Branzburg v. Hayes,*
408 U.S. 665 (1972) ............................................................................................................12

*Brown & Williamson v. Wigand,*
228 A.D.2d 187 (1st Dep't 1996) ........................................................................................8

*Concord Boat Corp. v. Brunswick Corp.,*
169 F.R.D. 44 (S.D.N.Y. 1996) .........................................................................................15

*Doe v. Cummings,*
1994 WL 315640 (Sup. Ct. St. Lawrence Co. Jan. 18, 1994)...................................................8

*Emerson v. Port,*
303 A.D.2d 229 (1st Dep't. 2003) .....................................................................................14

*Fears v. Wilhelmina Model Agency, Inc.,*
2004 WL 719185 (S.D.N.Y. Apr. 1, 2004).........................................................................15

*Flynn v. NYP Holdings Inc.,*
235 A.D.2d 907 (3d Dep't 1997) ......................................................................................8, 9

*Gonzales v. NBC,*
194 F.3d 29 (2d Cir. 1999)........................................................................................ passim

*Guice-Mills v. Forbes,*
12 Misc. 3d 852 (Sup. Ct. N.Y. Co. 2006) ..........................................................................8

*In re Am. Tobacco Co.,*
880 F.2d 1520 (2d Cir.1989).................................................................................................4

*In re Application to Quash Subpoena to NBC, Inc.,*
79 F.3d 346 (2d Cir. 1996).............................................................................................4, 10

*In re Bextra and Celebrex Marketing Sales Practices & Prod. Liabl. Litig.,*
249 F.R.D. 8 (D. Mass. 2008)........................................................................................14, 15

*In re Brown & Williamson Tobacco Corp.,*
1996 WL 350827 (Sup. Ct. N.Y. Co. Feb. 28, 1996) ...........................................................6

*In re Candor Diamond Corp.*,
   26 B.R. 847 (Bankr. S.D.N.Y. 1983) ......................................................................15

*In re CBS*,
   232 A.D.2d 291 (1st Dep't 1996) ............................................................................8

*In re Consumer Union of U.S., Inc.*,
   495 F. Supp. 582 (S.D.N.Y. 1980) ...........................................................................7

*In re Fitch, Inc.*,
   330 F.3d 104 (2d Cir. 2003) ................................................................................5, 8

*In re Grand Jury Subpoenas Served on NBC*,
   178 Misc. 2d 1052 (Sup. Ct. N.Y. Co. 1998) ...........................................................7

*In re Grand Jury Subpoenas to Maguire*,
   161 Misc. 2d 960 (Westchester County Ct. 1994) ............................................10, 12

*In re Pan Am Corp.*,
   161 B.R. 577 (S.D.N.Y. 1993) ..............................................................................12

*In re Subpoena Duces Tecum to ABC*,
   189 Misc. 2d 805 (Sup. Ct. Queens Co. 2001) ...............................................6, 9, 10

*In re Subpoena Duces Tecum to Ayala*,
   162 Misc. 2d 108 (Sup. Ct. N.Y. Co. 1994) ............................................................6

*In re Subpoena to Donovan Slack*,
   No. 11-00073 (D.C. Cir. Mar. 8, 2011) ...................................................................4

*Johnson v. Metro. Gov't of Nashville & Davidson Cty.*,
   2009 WL 1952780 (M.D. Tenn. July 2, 2009) .......................................................16

*Katz v. Batavia Marine & Sporting Supplies, Inc.*,
   984 F.2d 422 (Fed. Cir. 1993) ..............................................................................15

*Lipinski v. Skinner*,
   781 F. Supp. 131 (N.D.N.Y. 1991) ..........................................................................9

*Lonegan v. Hasty*,
   2008 WL 41445 (E.D.N.Y. Jan. 1, 2008) .............................................................6, 8

*McKevitt v. Pallasch*,
   339 F.3d 530 (7th Cir. 2003) ................................................................................15

*O'Neill v. Oakgrove Construction, Inc.*,
   71 N.Y.2d 521 (N.Y. 1988) ........................................................................5, 6, 7, 13

*Patterson v. Burge,*
    2005 WL 43240 (N.D. Ill. Jan. 6, 2005) ................................................................................15

*People v. Griffin,*
    1992 WL 474518 (Sup. Ct. N.Y. Co. Nov. 12, 1992) ..............................................................8

*People v. Lyons,*
    151 Misc. 2d 718 (Buffalo City Ct. 1991) ..............................................................................8

*People v. Marahan,*
    81 Misc. 2d 637 (Sup. Ct. Kings Co. 1975) ...........................................................................9

*Perito v. Finklestein,*
    51 A.D.3d 674 (2d Dep't 2008) ......................................................................................10, 12

*Persky v. Yeshiva Univ.,*
    2002 WL 31769704 (S.D.N.Y. Dec. 10, 2002) ................................................................12, 13

*PPM Am., Inc. v. Marriott Corp.,*
    152 F.R.D. 32 (S.D.N.Y. 1993) .............................................................................................13

*Schaghticoke Tribal Nation v. Kempthorne,*
    587 F. Supp. 2d 389 (D. Conn. 2008) ...................................................................................13

*Sikelianos v. City of N.Y.,*
    2008 WL 2465120 (S.D.N.Y. June 18, 2008) ........................................................................8

*Summit Tech., Inc. v. Healthcare Capital Group, Inc.,*
    141 F.R.D. 381 (D. Mass. 1992) ...........................................................................................11

*United States v. Harwood,*
    998 F.2d 91 (2d Cir. 1993) ....................................................................................................10

*United States v. Fed'n of Physicians & Dentists, Inc.,*
    63 F. Supp. 2d 475 (D. Del. 1999) ........................................................................................15

*United States v. Fountain View Apts., Inc.,*
    2009 WL 1905046 (M.D. Fla. July 1, 2009) .........................................................................11

*United States v. Marcos,*
    1990 WL 74521 (S.D.N.Y. Jun. 1, 1990) .............................................................................11

*von Bulow v. von Bulow,*
    811 F.2d 136 (2d Cir. 1987) ....................................................................................................5

**STATUTES**

Fed. R. Civ. P. 26(b)(2)(C) ...........................................................................................................14

Fed. R. Civ. P. 45(c)(1) .......................................................................................................14

Fed. R. Civ. P. 45(c)(2)(B) .................................................................................................15

Fed. R. Evid. 501 ..................................................................................................................4

Fed. R. Evid. 801(c) ...........................................................................................................10

Fed. R. Evid. 902(6) ...........................................................................................................13

N.Y. Civ. Rights Law § 79-h(a)(6) ......................................................................................8

N.Y. Civ. Rights Law § 79-h(b) ...........................................................................................5

N.Y. Civ. Rights Law § 79-h(c) .......................................................................................5, 9

## PRELIMINARY STATEMENT

Non-party movant Jesse Eisinger, a journalist, respectfully submits this memorandum of law in support of his motion to quash a subpoena seeking his testimony in the underlying civil litigation brought by plaintiffs Janet and James Baker (the "Bakers" or "plaintiffs") against defendant Goldman Sachs & Co. ("Goldman") for, *inter alia*, breach of contract, breach of fiduciary duty and unfair trade practices. The lawsuit arises out of services Goldman provided in connection with the sale of the Bakers' company, Dragon Systems, Inc. ("Dragon"), to Lernout & Hauspie Speech Products N.V. ("L & H"). The subpoena seeks the fruits of newsgathering that are protected from these routine discovery demands by New York state law, the New York Constitution and the First Amendment. Plaintiffs cannot overcome these statutory and constitutional barriers and, even apart from these protections, there is "good cause" pursuant to Rule 45(c) to deny plaintiffs' request for this deposition. Therefore, Mr. Eisinger respectfully requests that the subpoena be quashed.

## BACKGROUND

L & H announced the acquisition of Dragon, which was guided in part by Goldman, in March of 2000. Declaration of Gayle C. Sproul ("Sproul Decl."), Ex. H, D. Adamson, "Lernout & Hauspie to acquire Dragon Systems for 5.45 million shares," *MarketWatch* Mar. 28, 2000. Mr. Eisinger, then a reporter for the *Wall Street Journal* (the "*Journal*"), wrote articles about L & H in February, August and December 2000, each of which raised doubts about the bona fides of L & H's sales data and its long-term prospects. Plaintiffs have cited at least some of this coverage as anecdotal support for their claims against Goldman, contending that Goldman apparently put less effort into its review of L & H than did the *Journal*, particularly with respect to L & H's reported Asian growth and revenue.

**The Underlying Litigation**

The underlying litigation arises from a dispute between Dragon and Goldman, their investment bankers. According to the complaint, plaintiffs hired Goldman to provide "comprehensive financial advice" in connection with the sale of their company, Dragon, to L & H. Sproul Decl., Ex. E, Compl. ¶¶ 1, 17, 29-63. Plaintiffs "expected Goldman as 'exclusive financial advisor' to drive the analysis of L & H deal and give them comprehensive, complete and competent advice and assistance in negotiating and consummating Dragon's merger with L & H." *Id.* ¶ 29. Plaintiffs contend that Goldman failed, *inter alia*, to analyze and verify L & H's reported Asian growth and revenue, which was "necessary and critical to a proper valuation analysis of L & H stock." Compl. ¶¶ 94-96. The acquisition was completed on June 7, 2000. *Id.* ¶ 4.

Plaintiffs initially alleged claims against Goldman for breach of fiduciary duty, unfair trade practices, breach of contract, negligence, negligent misrepresentation, intentional misrepresentation and bad faith. Compl. ¶¶ 147-207. Goldman moved to dismiss the complaint, and that motion was granted in part and denied in part. Sproul Decl., Ex. F. Plaintiffs' claims for breach of fiduciary duty, negligence and unfair trade practices remain pending. *Id.*

**The Journal Articles**

Plaintiffs' complaint comprises sixty-six pages and over two hundred seven paragraphs. Apart from vague references to the *Journal*'s coverage in the complaint, it is substantively referred to in only two of those paragraphs. Compl. ¶¶ 136-137. In addition, Goldman's alleged failure to investigate L & H's Asian markets, a significant focus of the *Journal's* reporting, is only a small potion of the failures attributed to Goldman in the complaint. *Compare id.* ¶¶ 64-71 *with id.* ¶¶ 72-81 (Goldman allegedly failed to investigate and verify L & H's "strategic partnerships"); *id.* ¶¶ 97-98 (Goldman allegedly failed to conduct an analysis of "the impact of

2

the Dictaphone transaction on L & H's finances"); *id.* ¶¶ 112-115 (citing various research memoranda that Goldman prepared for other clients, in which "concerns with transparency at L & H and confidence in L & H's estimates of financial performance" were expressed, when such concerns were not shared with Dragon).

Plaintiffs note in their complaint that "[i]n late summer and fall of 2000, the investing public began to learn pieces of the true story behind L & H's purported success." Compl. ¶ 135. The complaint thus appears to ignore Mr. Eisinger's February 16, 2000 article, "Lernout & Hauspie Gets Quiz As Earnings Scrutiny Spreads," published before the L & H/Dragon deal was even announced. Sproul Decl., Ex. B ("the February article"). That article raised pointed questions about L & H's projected earnings, noting that "skeptics contend that the core voice-recognition software business isn't growing as fast as it should be" and that "[t]hey happen to be selling a lot in the far East, but they've hit a wall in the rest of the world. It's only a matter of time before the stock hits that same wall." *Id.*, p. 3.

Next, on or about August 8, 2000, the *Journal* published another article about L & H, entitled "Tech Firm's Korean Growth Raises Eyebrows," ("the August article"). Sproul Decl., Ex. C; Compl. ¶ 136. This time the *Journal* reported that "some companies that L & H has identified as Korean customers say they do no business at all with L & H. Others say their purchases have been smaller than L & H says." Sproul Decl., Ex. C, p. 2. The article again references that skeptical analysts are "inquir[ing] about the Korean sales," and quotes one such analyst as stating, "It remains very difficult to find customers in Korea and around the area doing large, successful implementations of their voice-recognition software." *Id.* The article further states that reporters contacted eighteen of thirty companies claimed by L & H to be customers,

and that thirteen responded to inquiries. The article identifies many of those who responded and in most cases describes their responses, and the replies of L & H to the reported discrepancies.

Last, on or about December 22, 2000, the *Journal* published an article detailing the views of a money manager who at the time hosted an Internet radio show, *The Other Side of the Tracks*, which had been sharply critical of L & H in August 2000: "He accused the company's management of exaggerating its prospects, relying on rapid-fire acquisitions and reporting a dubious surge in Asian sales." Sproul Decl., Ex. D.

**The Subpoena**

On March 1, 2011, plaintiffs served a subpoena on counsel for Mr. Eisinger, requiring him to appear for deposition on March 18, 2011 (the "Subpoena").[1] Sproul Decl. ¶ 2 & Ex. A.

## ARGUMENT

### I.

### NEW YORK'S SHIELD LAW PROTECTS A REPORTER'S UNPUBLISHED WORK PRODUCT FROM DISCLOSURE

The Subpoena should be quashed because it calls for testimony that is protected from disclosure under the Shield Law.[2] The Shield Law creates a privilege for professional journalists

---

[1] Counsel for the movant accepted service on behalf of Mr. Eisinger, now a reporter for Propublica.org. Sproul Decl., ¶ 2. Counsel for Mr. Eisinger suggested that he would be willing to provide a declaration stating that the articles as published are true to the best of his knowledge and belief, if permitted by Goldman; plaintiffs' counsel rejected that proposal on March 10. *Id.*, ¶¶ 8-9.

[2] Where a subpoena is served in connection with a diversity action pending in the District of Massachusetts, but issued out of the Southern District of New York, requiring the production of documents or testimony from a New York-based reporter or publisher, "[i]t is clear that any privileges relating to the information sought are governed by New York law." *In re Application to Quash Subpoena to NBC, Inc.*, 79 F.3d 346, 351 (2d Cir. 1996) (citing Fed. R. Evid. 501; *In re Am. Tobacco Co.*, 880 F.2d 1520, 1527 (2d Cir.1989) ("in a diversity case the existence of a privilege is to be determined by reference to state law")); *see also In re Subpoena to Donovan Slack*, No. 11-00073 (D.C. Cir. Mar. 8, 2011) (applying privilege law articulated by the D.C. Circuit to matter pending in the District of Massachusetts where subpoena was issued in Washington, D.C.).

against compelled testimony concerning unpublished news secured in the course of newsgathering activities, regardless of whether the unpublished material was obtained under a promise of confidentiality.[3]  N.Y. Civ. Rights Law § 79-h(c).  While the privilege for non-confidential information is not absolute, a party seeking such testimony bears a heavy burden to overcome the privilege.  Plaintiffs must make "a *clear and specific* showing" that the testimony

      (i)     is *highly material and relevant*;

      (ii)    is *critical or necessary* to the maintenance of [his] claim, defense or proof of an issue material thereto; *and*

      (iii)   is not obtainable from *any* alternative source.

*Id.* (emphasis added).[4]

The Legislature enacted the Shield Law following the New York Court of Appeals' recognition that a privilege protecting the non-confidential information collected by journalists was independently required by the New York Constitution.  *See O'Neill v. Oakgrove Constr., Inc.*, 71 N.Y.2d 521, 526 (1988).  The protection is extended to journalists because the "autonomy of the press would be jeopardized if resort to its resource materials, by litigants seeking to utilize the newsgathering efforts of journalists for their private purposes, were routinely permitted."  *Id.*  Courts have acknowledged that, without the Shield Law, journalists

---

[3] To the extent that any of the testimony plaintiffs attempt to elicit would implicate confidential sources or information, the statute provides for absolute protection.  N.Y. Civ. Rights Law § 79-h(b) (a journalist cannot be compelled to "disclose any news obtained or received in confidence or the identity of the source of any such news").

[4] Likewise, the Second Circuit repeatedly has recognized that a "journalist . . . can resist a third-party subpoena that seeks information related to the journalist's professional activity," *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003); *Gonzales v. NBC,* 194 F.3d 29, 35 (2d Cir. 1999), under a privilege that extends broadly to the newsgathering process itself, and includes all information obtained in the course of newsgathering, whether confidential or not.  *See, e.g., von Bulow v. von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987) (privilege "emanates from the strong public policy supporting the unfettered communication of information by the journalist to the public" and protects "the *process* of newsgathering.") (emphasis added).

would be unduly burdened by litigants' requests for their information and diverted from the important tasks of gathering and reporting the news. *Id.* at 526-27; *In re Brown & Williamson Tobacco Corp.*, 1996 WL 350827, at *3 (Sup. Ct. N.Y. Co. Feb. 28, 1996) ("Attempts to obtain evidence from [journalists] as nonparties would, if unrestrained, subject [them] to enormous depletions of time and resources"). The "very heavy" burden imposed by the Shield Law seeks to alleviate these significant concerns. *In re Subpoena Duces Tecum to ABC*, 189 Misc. 2d 805, 808-09 (Sup. Ct. Queens Co. 2001); *see also In re Subpoena Duces Tecum to Ayala*, 162 Misc. 2d 108, 114 (Sup. Ct. N.Y. Co. 1994) ("In . . . creating the 'qualified privilege,' the Legislature adopted the . . . tripartite balancing test as a stringent condition precedent to any successful attempt to compel disclosure of unpublished nonconfidential news obtained by a reporter.").

The privilege extends to all information obtained in the course of newsgathering, whether confidential or not. *O'Neill*, 71 N.Y.2d at 527 ("confidentiality or the lack thereof has little, if anything, to do with the burdens on the time and resources of the press"); *Lonegan v. Hasty*, 2008 WL 41445, at *2 (E.D.N.Y. Jan. 1, 2008) (while the prospective harm to the flow of information to the public "is perhaps less obvious" where non-confidential information is involved, it is "no less real."). Indeed, courts have long recognized that allowing litigants free rein to compel discovery from reporters – even where no confidential source is implicated – diminishes the flow of information to the public in a number of ways. For example:

      1.    Requiring a journalist to testify about information collected in the course of gathering the news deters sources who might otherwise be willing to speak to the press. *See, e.g., Gonzales,* 194 F.3d at 34-35 (recognizing that exposing press files to litigant scrutiny increases the risk that "potential sources [will be] deterred from speaking

6

to the press, or insist[ ] on remaining anonymous"). The reporter's privilege thus exists to prevent journalists from "being used as investigative agents" of litigants. *In re Grand Jury Subpoenas Served on NBC*, 178 Misc. 2d 1052, 1055 (Sup. Ct. N.Y. Co. 1998).

       2.     Permitting routine testimony to be compelled from reporters burdens the press with unacceptable costs of subpoena compliance. As the New York Court of Appeals recognized in *O'Neill*, "because journalists typically gather information about . . . matters . . . that often give rise to litigation, attempts to obtain evidence [from the press] would be widespread if not restricted." 71 N.Y.2d at 526-27; *see also Gonzales*, 194 F.3d at 35 (recognizing that subpoenas to the press would be "standard operating procedure" without a reporter's privilege).

       3.     Permitting routine discovery from reporters is likely to discourage journalists from reporting on matters that are likely to be the subject of litigation. *See, e.g., In re Consumer Union of U.S., Inc.*, 495 F. Supp. 582, 586 (S.D.N.Y. 1980) (compelled disclosure of magazine's unpublished information would inhibit its "coverage of provocative issues important to the pubic"). Absent protection for unpublished information, reporters and editors might decide to eliminate from news reports references to sources likely to attract subpoenas or to avoid potentially controversial stories altogether.

       4.     Compelled disclosure of newsgathering information also creates undesirable incentives "for press entities to clean out files containing potentially valuable information," making reporters less effective and news reports less informative. *Gonzales*, 194 F.3d at 35.

Such "concern[s] about protecting the press from the burdens of nonparty discovery," have led "both federal and New York courts [to] recognize a special privilege that can be asserted by journalists resisting a subpoena." *In re Fitch, Inc.*, 330 F.3d at 108. New York courts have routinely applied the qualified privilege to quash subpoenas that seek unpublished information in both civil and criminal cases. *See, e.g., Flynn v. NYP Holdings Inc.*, 235 A.D.2d 907 (3d Dep't 1997); *In re CBS*, 232 A.D.2d 291 (1st Dep't 1996); *Brown & Williamson v. Wigand*, 228 A.D.2d 187 (1st Dep't 1996); *Doe v. Cummings*, 1994 WL 315640 (Sup. Ct. St. Lawrence Co. Jan. 18, 1994); *People v. Griffin*, 1992 WL 474518 (Sup. Ct. N.Y. Co. Nov. 12, 1992); *People v. Lyons*, 151 Misc. 2d 718 (Buffalo City Ct. 1991). *See also Sikelianos v. City of N.Y.*, 2008 WL 2465120, at *1-2 (S.D.N.Y. June 18, 2008) ("a litigant seeking nonconfidential materials *will not be granted unfettered access to 'sift through [journalists] files* in search of information supporting [his] claims'") (quoting *Gonzales*, 194 F.3d at 35)) (alterations in original; emphasis added); *Lonegan*, 2008 WL 41445, at *2 (recognizing "the heavy burdens that would be placed on the press if litigants were free to rummage through journalists' files whenever a matter that had received attention in the press became the subject of litigation").

The testimony sought by the Subpoena – testimony concerning information secured in the course of newsgathering activities and the nature of those activities – is squarely protected under the Shield Law and the First Amendment.[5] *See, e.g., Guice-Mills v. Forbes*, 12 Misc. 3d 852, 856 (Sup. Ct. N.Y. Co. 2006) ("litigant in a civil case seeking testimony from a journalist about his news sources should be subject to the same balancing test required of any other resource

---

[5] There is, and can be, no argument that Mr. Eisinger, who was employed by the *Journal* at the time of publication of the articles discussed above, is not a professional journalist covered by the statutory privilege. N.Y. Civ. Rights Law § 79-h(a)(6) (defining "professional journalist" as "one who, for gain or livelihood, is engaged in gathering, preparing, collecting, writing [or] editing . . . news intended for newspaper, magazine, news agency, press association or wire service or other professional medium . . . for dissemination to the public . . .").

material"); *People v. Marahan*, 81 Misc. 2d 637, 650 (Sup. Ct. Kings Co. 1975) (newspaper reporter not required to testify as to news story where testimony sought would concern "news or the source of news" protected by Shield Law); *Lipinski v. Skinner*, 781 F. Supp. 131, 139 (N.D.N.Y. 1991) ("deposition subpoena impinges on First Amendment rights of free flow of information and a reporter's interest in pursuing stories and news gathering to some degree, because the journalists must testify at their depositions and may be required to testify in court as well rather than being free to pursue their daily professional activities"). Once the privilege has been established, the burden shifts to the litigant to demonstrate that proper grounds exist to overcome the privilege. *In re ABC*, 189 Misc. 2d 805, 808 (Sup. Ct. N.Y. Co. 2001); *accord Gonzales*, 194 F.3d at 36. In the absence of the clear and specific showing required under the Shield Law, the Subpoena must be quashed. Plaintiffs have not made – and cannot make – the requisite showing.

## II.
## PLAINTIFFS CANNOT MEET THEIR BURDEN

### A.      The Information Sought Is Not Critical or Necessary Plaintiffs' Case.

In order to compel Mr. Eisinger's testimony, plaintiffs must first establish, by clear and convincing evidence, that his testimony is "highly material and relevant" *and* "critical or necessary" to their case. N.Y. Civil Rights Law § 79-h (c). Plaintiffs have not met, and indeed cannot meet, the burden necessary to overcome the Shield Law. Even if they could establish in the first instance that Mr. Eisinger's testimony could be "highly material and relevant" (they cannot), they certainly cannot satisfy their burden to make a "clear and specific showing" that the testimony is "critical or necessary" to the prosecution of their claims. *Id.*

Courts have emphasized that a reporter's testimony is not "critical or necessary" unless the case "'virtually rises or falls with admission or exclusion of the proffered evidence.'" *Flynn,*

9

235 A.D.2d at 908 (quoting *In re Application to Quash Subpoena to NBC*, 79 F.3d at 351 (interpreting New York statutory privilege)) (additional quotation marks and citations omitted). Thus, it is not enough for the plaintiffs to allege that the reporter's information "would be useful," but rather they must establish that their case "could not be presented" successfully without Mr. Eisinger's testimony. *Perito v. Finklestein*, 51 A.D.3d 674, 675 (2d Dep't 2008). *See also, e.g.*, *In re Grand Jury Subpoenas to Maguire*, 161 Misc. 2d 960, 965 (Westchester County Ct. 1994) (test is not merely whether the material may be helpful or probative, but whether "the action may be presented without it"); *In re Subpoena Duces Tecum to ABC*, 189 Misc. 2d at 808 ("general and ordinary impeachment material or matters which might arguably bear on the assessment of credibility of witnesses" insufficient to meet "critical or necessary" test).

Here, plaintiffs simply cannot demonstrate that their case "rises and falls" on the testimony of Mr. Eisinger. That testimony, to the extent that it is sought to probe the responses of the purported L & H customers, is hearsay. Fed. R. Evid. 801(c); *U.S. v. Harwood*, 998 F.2d 91, 97 (2d Cir. 1993) (affirming district court's decision quashing subpoena on grounds that reporter's testimony was hearsay). The identities of customers who could be interviewed and deposed to determine whether anyone from Goldman had ever contacted them to discuss facts related to L & H are readily available. Moreover, if Mr. Eisinger's testimony is sought only to show that the *Journal* was able to learn the reported information by calling the customers identified by L & H, that information does not prove any of the extant claims. Indeed, the steps taken by the *Journal* to investigate the matter, although perhaps of interest, are largely irrelevant – and certainly not *critical* – to *proof* of the claims in suit. Those claims – for breach of fiduciary duty, negligence and unfair trade practices – are against Goldman, and not the *Journal*,

and they cannot be proven by evidence of what the Journal did or what it was told. Indeed, plaintiffs would be far better served by questioning of Goldman's employees at depositions about whether they attempted to contact any of the customers identified or quoted in the August 2000 *Journal* article.

Moreover, a review of the lengthy complaint reveals that plaintiffs' claims against Goldman are largely based on grounds that are distinct from the claim that it failed to make sufficient inquiries into L & H's presence in the Asian markets: for example, plaintiffs claim that Goldman failed to ensure that information and data requested for due diligence purposes was produced (Compl. ¶ 60), it failed to investigate and verify L & H's "strategic partnerships" (*id.* ¶¶ 72-81), and it failed to conduct an analysis of "the impact of the Dictaphone transaction on L & H's finances" (*id.* ¶¶ 97-98). Plaintiffs also cite to various research memoranda that Goldman prepared for other clients, in which "concerns with transparency at L & H and confidence in L & H's estimates of financial performance" were expressed, but that these same concerns were not shared with Dragon. *Id.* ¶¶ 112-115. Where evidence sought from a journalist "is merely cumulative . . . it cannot be credibly urged that [it] is necessary or critical." *United States v. Marcos*, 1990 WL 74521, at *4 (S.D.N.Y. Jun. 1, 1990) (interpreting "necessary or critical" test).

Finally, the mere mention of the *Journal's* coverage in the complaint does not make testimony about it critical to the claims in suit. *See, e.g., United States v. Fountain View Apts., Inc.*, 2009 WL 1905046, at *3-4 (M.D. Fla. July 1, 2009) (granting motion to quash where news organization's investigation was cited in complaint); *Blum v. Schlegel*, 150 F.R.D. 42, 44 (W.D.N.Y. 1993) (granting motion to quash by author of article containing alleged perjurer's "views on some of the central issues in the lawsuit"); *Summit Tech., Inc. v. Healthcare Capital Group, Inc.*, 141 F.R.D. 381, 383-85 (D. Mass. 1992) (denying motion to compel where

11

allegedly libelous report relied on journalist's article); *see generally Perito*, 51 A.D.3d at 675 (moving party must establish that their case "could not be presented" without testimony); *In re Grand Jury Subpoenas to Maguire*, 161 Misc. 2d at 965 (question is whether "the action may be presented without" reporter's testimony).

Plaintiffs cannot demonstrate through a "clear and specific showing" that Mr. Eisinger's testimony is "critical or necessary" to the prosecution of their claims, and he therefore respectfully requests that the Subpoena be quashed.

**B.    The Information Is Available Elsewhere.**

Plaintiffs similarly have not and cannot establish that Mr. Eisinger is the only available source of the information concerning L & H's alleged misrepresentations regarding its Asian clients. Plainly he is not. Rather, the evidence plaintiffs purportedly seek with respect to L & H can be obtained from any number of alternative sources besides Mr. Eisinger, including customers of L & H, critical analysts and Goldman's own employees.

Case law "clearly establish[es] that "all reasonable attempts should be made to obtain information from non-press sources before there is any consideration of subpoenaing the press.'" *Blum*, 150 F.R.D. at 46 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 707 n.41 (1972)). Under the Shield Law "[i]t is not the job of the court or the journalist claiming the privilege" to identify other sources from whom the information could be obtained, rather "[i]t is up to [the party seeking privileged testimony] to make a clear and specific showing that the information is not available from other sources." *Persky v. Yeshiva Univ.*, 2002 WL 31769704, at *4 & n.2 (S.D.N.Y. Dec. 10, 2002) (interpreting criteria "'indentical' to those under the . . . New York statute"); *see also In re Pan Am Corp.*, 161 B.R. 577, 585 (S.D.N.Y. 1993) (a party that "has not even worked up a sweat," cannot defeat the privilege); *Perito*, 51 A.D.3d at 675 (affirming

denial of subpoena where party "failed to demonstrate that the information sought was not obtainable from another source").

Only when a journalist appears to be the *only* individual with reasonably obtainable, relevant information should he or she be required to disclose information collected in the newsgathering process. *PPM Am., Inc. v. Marriott Corp.*, 152 F.R.D. 32, 34-36 (S.D.N.Y. 1993) (finding that party had "exhausted all other avenues" for obtaining "critical" information). As the Second Circuit has observed, without requiring lawyers to seek alternative sources *before* permitting them to subpoena the press for the information, "it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims." *Gonzales*, 194 F.3d at 35. The "autonomy of the press would be jeopardized if resort to its resource materials, by litigants seeking to utilize the newsgathering efforts of journalists for their private purposes, were routinely permitted." *O'Neill*, 71 N.Y.2d at 526. Thus, even where the court has found that the party's claim "could indeed rise or fall" upon the reporter's testimony, the court will not compel that testimony unless and until she can "make a clear and specific showing that the information is not available from other sources." *Persky*, 2002 WL 31769704, at \*3-4.

This Court should not permit plaintiffs to treat Mr. Eisinger as their investigatory tool, or even their investigatory model. As noted above, other sources of similar information are readily identifiable and may be questioned, and the articles themselves, which are self-authenticating, Fed. R. Evid. 902(6) ("[p]rinted materials purporting to be newspapers or periodicals" do not require "extrinsic evidence of authenticity as a condition precedent to admissibility"); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 397 (D. Conn. 2008) ("news and magazine articles . . . are self-authenticating under Rule 902(6) of the Federal Rules of

Evidence"), can be used as a basis for cross-examination. Unless and until plaintiffs demonstrate that they cannot make their particular point in any manner other than by questioning Mr. Eisinger – which they cannot do – the privilege may not be overcome and the Subpoena should be quashed. *See, e.g., Emerson v. Port*, 303 A.D.2d 229, 230 (1st Dep't. 2003) (failure "to demonstrate that such news [was] 'not obtainable from any alternative source'" precluded compelled disclosure) (citation omitted).

### III.
### EVEN WHERE NOT SUBJECT TO A PRIVILEGE, THE COURT SHOULD ENSURE THAT A NON-PARTY IS NOT UNDULY BURDENED BY A SUBPOENA SEEKING NON-PROBATIVE INFORMATION

Assuming only for the sake of argument that the Subpoena should not be quashed pursuant to the Shield Law, Rule 45 independently provides that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(c)(1). Rule 26 elaborates that "the court must limit the frequency or extent of discovery otherwise allowed . . . if it determines that: ... the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" or "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C). Rule 26(b)(2)(c) "initially governs enforcement of a Rule 45 subpoena." *In re Bextra and Celebrex Marketing Sales Practices & Prod. Liabl. Litig.*, 249 F.R.D. 8 (D. Mass. 2008).

Thus, even where a privilege is not implicated, when "discovery is sought from a non-party, the Court should be particularly sensitive to weighing the probative value of the

information sought against the burden of production on the non party." *Fears v. Wilhelmina Model Agency, Inc.*, 2004 WL 719185 at *1 (S.D.N.Y. Apr. 1, 2004) (citing Fed. R. Civ. P. 45(c)(2)(B)); *see also Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993) ("fact of nonparty status may be considered by the court in weighing the burdens imposed in the circumstances"); *United States v. Fed'n of Physicians & Dentists, Inc.*, 63 F. Supp. 2d 475 (D. Del. 1999) ("'even if the information is not privileged, . . . it still may be oppressive or unreasonable to require disclosure'") (citation omitted). "Restrictions on discovery may be broader where a non-party is the target of discovery to protect such third parties from unnecessary harassment, inconvenience, expense," and thus a non-party "to object to [a] subpoena on grounds of relevancy." *In re Candor Diamond Corp.*, 26 B.R. 847, 849 (Bankr. S.D.N.Y. 1983). "[W]hat constitutes an undue burden in a given instance is a case specific inquiry . . . that turns on 'such factors as relevance . . . and the burden imposed.'" *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 53 (S.D.N.Y. 1996) (citations omitted); *see also In re Bextra and Celebrex Marketing Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. at 12 ("The first step in determining whether 'the burden or expense of the proposed discovery outweighs its likely benefit' within the meaning of Rule 26(b)(2)(C)(iii) is to assess the relevance and probative value" of the testimony sought) (citation omitted).

Thus, even in jurisdictions where that do not recognize a specific "reporter's privilege," courts have not hesitated in similar circumstances to rely on the federal rules to quash subpoenas issued to journalists and news organizations. In *McKevitt v. Pallasch*, 339 F.3d 530 (7th Cir. 2003), for example, the Seventh Circuit stated that "courts should simply make sure that a subpoena duces tecum directed to the media, like any other subpoena duces tecum, is reasonable in the circumstances." *Id.* at 533; *see also, e.g., Patterson v. Burge*, 2005 WL 43240, at *3

(N.D. Ill. Jan. 6, 2005) (under the standards of Rule 45(c), speculation that outtakes of interviews conducted by television station might contain relevant information does not outweigh burden on respondents, including dangerous precedent that "private parties in a civil suit can call on the press to turn over the fruits of its investigative efforts"); *Johnson v. Metro. Gov't of Nashville & Davidson Cty.*, 2009 WL 1952780, *4-7 (M.D. Tenn. July 2, 2009) (quashing subpoena for journalist's deposition pursuant to balancing test under Rule 26(c), finding that "[movant's] status as a journalist, combined with the dubious value of his testimony, makes it particularly inappropriate for this deposition to go forward").

Here, as discussed above, the probative value of the testimony sought from Mr. Eisinger pales in comparison to the implications of compelling testimony regarding a news investigation. Although the Journal's articles open the door to the troubled world of L & H, that door has, by this late juncture in discovery (Sproul Decl., ¶ 11), likely been opened and entered and shut by plaintiffs. Mr. Eisinger's testimony is therefore surplusage which can add no substantive impact to plaintiffs' claims. Thus, there is no reason to insist on the certain intrusion that Mr. Eisinger's deposition represents here.

## CONCLUSION

For the foregoing reasons, non-party movant Jesse Eisinger respectfully requests that this Court grant his motion to quash in all respects.

Dated: March 15, 2011                    LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By: _____
        Gayle C. Sproul
        Amanda M. Leith

321 W. 44th Street, Suite 510
New York, NY 10036
Tel: (212) 850-6100
Fax: (212) 850-6299
gsproul@lskslaw.com
aleith@lskslaw.com

*Counsel for Non-Party Jesse Eisinger*